Peter G. Bertling (SBN 131602)
Bertling Law Group
21 East Canon Perdido Street, Suite 204B
Santa Barbara, CA 93101
Telephone: 805-879-7558
Facsimile: 805-869-1597
peter@bertlinglawgroup.com

Attorneys for Plaintiff KATHLEEN F. BOWERING, Individually, and
on Behalf of the ESTATE OF MELISSA F. ROBISON, Deceased.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHLEEN F. BOWERING, Individually, and on Behalf of the ESTATE OF MELISSA F. ROBISON, Deceased, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No.: <br><br> **COMPLAINT FOR DAMAGES** |

COMES NOW, Plaintiff Kathleen F. Bowering, individually, and on behalf of the Estate of Melissa F. Robison, deceased, by and through counsel, states as follows for her Complaint against Defendant United States of America:

**<u>Jurisdiction and Venue</u>**

1.     Ms. Bowering is the daughter of Ms. Robison, and she is the proper party to bring this action on behalf of the Estate of Melissa F. Robison and the proper party to bring all claims against Defendant in this action.

2.     This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*.  This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

3.      In compliance with 28 U.S.C. § 2675, a notice of administrative claim was filed with the Department of Veterans Affairs, which is attached as **Exhibit A**.  That claim was received by the Department of Veteran Affairs on February 9, 2021.

4.      The Department of Veterans Affairs denied the administrative tort claim on September 8, 2021.

5.      Accordingly, Plaintiff's causes of action are ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

6.      Further, this action is properly brought within the six-month period set forth in 28 U.S.C. 2401(b).

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) as the cause of action as to Defendant United States arose within the Central District of California at the Long Beach, California VA Medical Center ("Long Beach VAMC") at 5901 E. 7th St., Long Beach, CA 90822.

8.      At all times relevant to this action, the United States owned and operated the Long Beach VAMC and its affiliated outpatient care centers.

9.      At all times relevant to this action, the agents, servants, employees, and personnel of the United States were acting within the course and scope of their employment in providing and/or failing to provide medical care and treatment to Ms. Robison.

10.      Ms. Robison was a veteran of the United States Army, and thus was entitled to medical care and treatment at the Long Beach VAMC and its affiliated outpatient care centers.

11.      The medical care described as follows was provided to Ms. Robison at the Long Beach VAMC and/or its affiliated clinics unless otherwise stated.

12.      Plaintiff has had this matter reviewed by a Board-certified radiologist and a Board-certified pulmonologist who have reviewed Ms. Robison's medical records and will testify that the medical care provided to Ms. Robison at the Long Beach VAMC fell below the standard of care, resulted in the delayed diagnosis and treatment of

tuberculosis, and caused her death. These experts' reports are attached as **Exhibit B and Exhibit C**.

## Allegations

13.     Plaintiff restates and re-alleges paragraphs 1 through 12 as if fully stated herein.

14.     Ms. Robison was a 43-year-old United States Army veteran at the time of her death on May 9, 2020.

15.     Ms. Robison had also worked with the U.S. Coast Guard Auxiliary and volunteered to work with homeless veterans, including at an outdoor event which involved an overnight stay in a tent, and also regularly encountered homeless veterans at VA facilities. This history was known, or should have been known, to Ms. Robison's VA healthcare providers.

16.     Ms. Robison presented to the Long Beach VAMC emergency department on April 17, 2019 with complaints of a productive cough, chest tightness, congestion, and fatigue she had been experiencing for the previous two months.

17.     A physician's assistant, Kerry A. Homotoff ("Ms. Homotoff"), documented in Ms. Robison's chart that she had previously been seen "several times" for these symptoms. Various treatments had been unsuccessful, including Z-pak, nebulizer, inhaler, Medrol dosepak, and over-the-counter medications. Notably, Ms. Robison's respiratory symptoms persisted despite these treatments. The PA further documented that the patient had no history of smoking or asthma. On physical examination, it was noted, "Breath sounds throughout, sounds tight, scattered rhonchi."

18.     A chest x-ray was ordered and performed; however, the VA radiologist, Dr. Asha Goud, identified no abnormalities.

19.     A diagnosis of "bronchitis/early PNA" was made, a DuoNeb treatment administered, and prescriptions were given for Albuterol, Doxycycline, and Tessalon Perles.

///

- 3 -
**COMPLAINT FOR DAMAGES**

20.     Despite this treatment, Ms. Robison's symptoms continued to persist. She presented again to the emergency department approximately three weeks later, on May 11, 2019.

21.     Another physician's assistant in the ED, Carla F. Tapia ("Ms. Tapia"), documented Ms. Robison's symptoms as cough, congestion, fever, body aches, and "burning to her lungs and tightness to her chest with coughing."

22.     Another chest x-ray was performed. Again, the radiologist who interpreted the imaging, Dr. Baruch Meer, did not identify any abnormalities.

23.     During this ED visit, Ms. Robison herself reportedly "requested CT chest to r/o fungal infection." The attending physician in the ED, "Dr. Barry," however, only recommended Ms. Robison to follow up with her primary care provider. She was diagnosed with an upper respiratory infection and advised to take Robitussin, Albuterol, and Tessalon Perles.

24.     According to the secure messaging notes in the patient's VA medical records, Ms. Robison sent a message to her VA providers the following day, May 12, 2019, stating "I am in need of a consult to pulmonary clinic. I have had bronchitis since February and just came down with another respiratory infection. This may be bacterial or fungal as previous treatments have not completely cleared it out . . . Can you place a consult for pulmonary?"

25.     On May 13, 2019, a secure message reply was sent by a nurse at the VA, Devi Athiappan, RN ("Nurse Athiappan"), stating "we will see you Friday May 24 for a focused short visit with NP Erika Ongoco for your pulmonary concerns . . . Then we will see you after your training trip on June 18 at 9 am for a full appointment to establish care with Erika."

26.     According to Ms. Robison's chart, she was seen the following day, May 14, 2019, by NP Ongoco. This was a visit in the primary care clinic, not a pulmonology consult. In the chart, NP Ongoco noted Mr. Robison's symptoms included shortness of

breath, cough, and wheezing. NP Ongoco further diagnosed "cough" and prescribed for Mr. Robison promethazine.

27.     No chest imaging was ordered at this visit.

28.     Approximately three weeks later, on June 6, 2019, Mr. Robison again contacted her VA medical providers via secure messaging, stating, "Do you have any appointments today? I would like a culture. This week it is getting worse again . . . the color of the mucus is getting darker and I've been dizzy. I never got any call from a specialty clinic. I leave tomorrow for 10 days and I am concerned."

29.     In another message the same day, Ms. Robison noted she had significant coughing, enough to trigger vomiting, low fever, low blood pressure, and occasional shortness of breath and dizziness.

30.     Ms. Robison was not referred for a pulmonology consult, however.

31.     Five days after these messages, on June 11, 2019, NP Ongoco responded by writing an addendum: "ER precautions re: low BP, SOB, and dizziness. Last seen 5/14 with scheduled appt 6/18. 5/28 essentially normal CBC. Sx likely of chronic rhinitis. Prescribed promethazine which is an antihistamine. Recommend fluticasone nasal spray and montelukast."

32.     On June 18, 2019, Ms. Robison was seen in the primary care clinic for her scheduled visit with NP Ongoco. She continued to have the same symptoms she had been experiencing for four months, since February 2019, including productive cough, wheezing, fever, fatigue, and shortness of breath. NP Ongoco noted Ms. Robison was producing dark yellow thick sputum and had rhonchi in the bilateral upper lobes.

33.     Another chest x-ray was ordered, and NP Ongoco noted she would "consider PFT, pulmonary consult."

34.     Importantly, the chest x-ray, performed the same day, was interpreted to show "Persistent nodular opacity over the left middle lung zone which may represent summation artifact, focal atelectasis/scarring, or nodule. Recommend further evaluation with CT thorax."

- 5 -
**COMPLAINT FOR DAMAGES**

35.     Despite the radiologist's findings, there does not appear to have been any follow up on the part of NP Ongoco or any other VA providers, and no CT was ordered or recommended to Ms. Robison.

36.     While awaiting a follow up telephone appointment with NP Ongoco, Ms. Robison's condition continued to decline.

37.     On June 28, 2019, Ms. Robison contacted the Long Beach VAMC Women's Health Clinic again via Secure Messaging: "Hello I am running a fever again. This keeps happening. I don't see the lab results I took after our visit. Also I have not got a call from MRI."

38.     There was no response to Ms. Robison's message until July 1, 2019, at which point she had already been admitted to an outside hospital.

39.     Specifically, Ms. Robison was admitted to the emergency department at Long Beach Memorial Hospital on June 30, 2019 due to fever and because she was experiencing confusion and continued respiratory symptoms.

40.     Upon admission, it was quickly discovered that Ms. Robison was suffering from tuberculosis, and treatment commenced on July 2, 2019.

41.     After an additional two-week hospitalization, Ms. Robison was discharged home. However, her condition had already been significantly compromised by the length of time her TB went untreated. She was hospitalized several more times over the following months, suffered the collapse of her left lung, and underwent numerous procedures, including bronchoscopies, PEG and other tube placements, and ultimately thoracotomy, pneumonectomy, ECMO cannulation, and myocutaneous muscle flap performed at Johns Hopkins in March 2020.

42.     Because of her compromised condition, however, Ms. Robison succumbed to respiratory failure due to pulmonary tuberculosis and died on May 9, 2020.

43.     The overall clinical care and treatment provided to Ms. Robison by her healthcare providers at the Long Beach VAMC following her initial presentation to the

emergency department on April 17, 2019 fell below the standard of care in several respects and caused Ms. Robison's untimely death.

44.     Had Ms. Robison been provided adequate care by her Long Beach VAMC providers, she would be alive today.

45.     The standard of care was breached by Ms. Robison's VA providers' failure to timely identify the abnormalities present on her chest x-ray imaging from April and May 2019, as well as the failure to timely recognize the signs and symptoms of a respiratory illness that was persistent and in need of assessment by a pulmonary specialist.

46.     These breaches of the standard of care caused Ms. Robison's untimely death.

47.     As an initial matter, the VA radiologists who interpreted the April 17, 2019 and May 11, 2019 chest x-rays, Drs. Goud and Meer, breached the standard of care in failing to note the abnormal findings present on those x-rays and instead incorrectly interpreted those x-rays as normal.

48.     Specifically, in the April 17, 2019 chest x-ray, there is a density in the left para-hilar area. It is an abnormal density along the left side of the heart. That is indeed an abnormal finding and should have been reported as such. The failure of Dr. Goud to identify and note this abnormal finding was a breach of the standard of care. Importantly, the left main bronchus still appears normal on this x-ray.

49.     In the May 11, 2019 chest x-ray, the density seen on the April 17 x-ray is still present and, importantly, does not appear to have progressed over the intervening three weeks. Again, Dr. Meer's failure to note this abnormality was a breach of the standard of care. Notably, the left main bronchus is visible on this x-ray and still appears normal with only a small amount of narrowing and no volume loss, again indicating little progression since the previous x-ray.

50.     As noted, there is a concerning and persistent density in the left para-hilar area seen in both x-rays that should have been reported and acted upon by Ms. Robison's care team. The left main bronchus does appear normal in both x-rays with no volume

loss, which demonstrates the progression of the TB over that three-week period was still limited.

51.     The July 1, 2019 CT performed at Long Beach Memorial, however, does show significant narrowing of the tracheobronchial tree, severe narrowing of the left bronchus, and volume loss in the left lung, all of which demonstrate significant progression of the TB during the month of June 2019.

52.     It was imperative that the abnormalities seen on the April and May 2019 chest x-rays be reported by Drs. Goud and Meer, directly communicated to the patient's treating physician, and followed up on with a referral to a pulmonologist and a chest CT. The failure to do was a breach of the standard of care. The differential diagnosis would include lung cancer and granulomatous infection, requiring immediate further workup, which would have led to an earlier diagnosis of the TB infection in May 2019.

53.     The fact that the density was essentially unchanged between the April 17 and May 11 chest x-rays indicated that the infection was progressing slowly and therefore likely treatable. As noted, by the time a CT was performed at the private hospital on July 1, 2019, the narrowing of the tracheobronchial tree was significant, and the left bronchus was now severely narrowed and starting to have volume loss in the left lung, indicating that there was a significant progression of the TB infection over the course of the month of June given the minimal narrowing of the left bronchus seen on the April 17 and May 11 chest x-rays.

54.     In addition to the negligent readings of those chest x-rays, Ms. Robison's symptoms and clinical picture on their own mandated that she be referred to a pulmonary specialist following both the April and May visits by PA Homotoff, PA Tapia, Dr. Barry, and NP Ongoco.

55.     Indeed, Ms. Robison's respiratory symptoms of productive cough, shortness of breath, and chest tightness had persisted for several months without relief from several courses of treatments, including antibiotics. It was obvious that she was suffering from something more serious than "chronic cough" or even bronchitis. Her symptoms did not

abate no matter the treatments she was provided. She self-advocated and requested specialty consultation for these very reasons. The failure to refer Ms. Robison to a specialist following these visits was a breach of the standard of care by PA Homotoff, PA Tapia, Dr. Barry, and NP Ongoco.

56.     Had the April and May 2019 chest x-rays been properly read, or Ms. Robison's symptoms and clinical picture been properly assessed, and Ms. Robison been referred to a pulmonologist in April, May, or early June 2019, TB treatment and interventions would have been implemented and Ms. Robison would have had a successful recovery and would not have succumbed to complications from tuberculosis.

57.     It is well known and instructed as part of medical and nursing school curricula that the diagnosis of TB frequently requires a high index of suspicion. Once TB is considered, sputum or other specimens are collected for TB nucleic acid amplification test (NAAT), acid-fast bacilli (AFB) smear, growth detection, and drug-susceptibility testing.

58.     As noted in the ATS/CDC/IDSA official practice guidelines for diagnosis of TB (Lewinsohn, et al., CID 2017), it is recommended that smear microscopy, mycobacterial cultures, and molecular diagnostic assays be performed, rather than not, in all patients suspected of having pulmonary TB.

59.     Had Ms. Robison's symptoms and clinical picture been properly assessed, or had she been referred to a pulmonologist, these diagnostic tests would have been ordered and would have identified her TB disease earlier.

60.     Moreover, in the ATS/CDC/IDSA official practice guidelines on the treatment of TB (Nahid, et al., CID, 2016), it is noted that the decision to initiate combination chemotherapy for tuberculosis is based on clinical, radiographic, laboratory, patient, and public health factors. In addition, clinical judgment and the index of suspicion for tuberculosis are critical in making a decision to initiate treatment. The failure to timely diagnose and treat TB has been shown to worsen illness severity,

prolong patient suffering, increase the risk of patient death, and facilitate the transmission of the disease to the community.

61.     Successful cure of the TB disease and survival was probable for Ms. Robison had she received timely diagnosis and treatment of TB as recommended by US and international practice guidelines.

## **Wrongful Death**

62.     Plaintiff restates and re-alleges paragraphs 1 through 61 as if fully stated herein.

63.     As a provider of medical services to Ms. Robison, the United States and its agents, servants, or employees at the Long Beach VAMC and its affiliates, including but not limited to PA Homotoff, Dr. Goud, PA Tapia, Dr. Meer, Dr. Barry, and NP Ongoco, owed Ms. Robison a duty to provide medical care consistent with the governing standard of medical care.

64.     The agents, servants, or employees of the United States at the Long Beach VAMC and its affiliates, while acting within the scope of their employment, violated the applicable standards of medical care in the following respects:

      a.  Negligent failure to appropriately evaluate and treat Ms. Robison's chronic respiratory illness;

      b.  Negligent failure to appropriately assess Ms. Robison's risk factors for tuberculosis;

      c.  Negligent interpretation and reporting of chest x-rays;

      d.  Negligent failure to order or recommend a CT scan to evaluate Ms. Robison's repeated complaints and continuing symptoms;

      e.  Negligent failure to refer Ms. Robison to a pulmonologist, infectious disease, or other specialist for appropriate evaluation of her chronic respiratory illness;

///

  f. Negligent failure to provide prompt and appropriate medical advice and evaluations in response to Ms. Robison's numerous messages and self-advocacy;

  g. Negligent delay in diagnosing and treating tuberculosis; and

  h. Any and all other deviations from the standard of care which will be developed through further investigation, discovery, and expert review.

65. As a direct and proximate result of the forementioned negligence of Defendant, Ms. Robison suffered premature death from tuberculosis and related complications, and significant pain and suffering.

66. Consequently, Plaintiff claims the following damages:

  a. Compensation for loss of Ms. Robinson's love, companionship, emotional support, affection, assistance, protection, society, moral support, comfort, and care;

  b. Compensation for loss of Ms. Robison's training and guidance;

  c. Compensation for loss of the financial support of Ms. Robison, including future lost earnings;

  d. Compensation for medical bills incurred during the course of Ms. Robison's treatment for TB;

  e. Compensation for funeral and burial expenses;

  f. Compensation for loss of gifts, inheritances, and other benefits Plaintiff would have received from Ms. Robison;

  g. Compensation for household services; and

  h. Compensation for any other damages sustained as a proximate result of the negligence of the government's employees and/or agents.

//
///
///
///

- 11 -
**COMPLAINT FOR DAMAGES**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WHEREFORE, Plaintiff requests the Court grant judgment in her favor against Defendant in the amount of Two Million Dollars ($2,000,000.00), together with any other costs as she may be lawfully entitled to recover.

Respectfully submitted,

DATED: January 28, 2022          BERTLING LAW GROUP, INC.


*/s/ Peter G. Bertling*
Peter G. Bertling
Jemma Parker Saunders
Attorneys for Plaintiff
KATHLEEN F. BOWERING, Individually,
and on Behalf of the ESTATE OF
MELISSA F. ROBISON, Deceased.

- 12 -
**COMPLAINT FOR DAMAGES**

# EXHIBIT A

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| **Department of Veterans Affairs**<br>**Office of Chief Counsel (644/200)**<br>**650 E. Indian School Road, Bldg. 24**<br>**Phoenix, AZ 85012** | **Kathleen F. Bowering, Individually and on Behalf of**<br>**the Estate of Melissa F. Robison, deceased**<br>**c/o Brewster S. Rawls**<br>**Rawls Law Group P.C.**<br>**211 Rocketts Way, Suite 100**<br>**Richmond, VA 23231** |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY ☐ CIVILIAN | 4. DATE OF BIRTH<br>**09/05/1976**<br>**(decedent)** | 5. MARITAL STATUS<br>**Single** | 6. DATE AND DAY OF ACCIDENT<br>**See #8, Basis of Claim, Below** | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.)

**Kathleen F. Bowering ("Ms. Bowering") is the daughter of Melissa F. Robison ("Ms. Robison"). Ms. Robison was a veteran of the United States Army and received medical care at the Long Beach VA Medical Center in Long Beach, California ("Long Beach VAMC"). Ms. Robison died on May 9, 2020 as a result of negligent medical care she received from healthcare providers at the Long Beach VAMC.**

**Note: The Basis of Claim is continued on Attachment 1 to this claim form and, accordingly, Attachment 1 is incorporated herein by reference.**

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

**The negligence of VA healthcare providers as described in Box 8 above and the corresponding Attachment 1 caused the death of Melissa F. Robison, resulting in damages including Ms. Robison's pain and suffering and mental anguish, the pain and suffering and mental anguish suffered by her daughter, Kathleen F. Bowering, and other economic and non-economic losses, including, but not limited to: loss of love, affection, guidance, companionship, comfort, care, protection, attention and advice; loss of income, benefits, and earning capacity; funeral and burial expenses; medical expenses; and other losses.**

| 11. | WITNESSES |
|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
| **Kathleen F. Bowering**<br><br>**Healthcare providers of Ms. Robison at the Long Beach VA Medical Center**<br><br>**Continued on Attachment 2.** | **6616 Palo Verde Avenue, Twentynine Palms, CA 92277**<br><br>**5901 E. 7th Street, Long Beach, CA 90822** |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY<br>**$1,000,000.00** | 12c. WRONGFUL DEATH<br>**$1,000,000.00** | 12d. TOTAL (Failure to specify may cause forfeiture of your rights).<br>**$2,000,000.00** |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side).<br>**Brewster S. Rawls**<br>**Attorney for Claimant** | 13b. PHONE NUMBER OF PERSON SIGNING FORM<br>**(804) 782-0607** | 14. DATE OF SIGNATURE<br>**February 5, 2021** |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable
95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

**Exhibit A**
**Page 1**

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance? ☐ Yes    If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☐ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☐ No    17. If deductible, state amount.

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance? ☐ Yes    If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☐ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A <u>SUM CERTAIN</u> FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN <u>TWO YEARS</u> AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is <u>solely</u> for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) **BACK**

**Exhibit A**
**Page 2**

**Attachment 1 to FTCA Claim of Kathleen F. Bowering, Individually**
**and on Behalf of the Estate of Melissa F. Robison, deceased**

8.      **Basis of Claim** – *continued from SF-95*

It should be noted that Ms. Robison, a U.S. Army veteran who had also worked with the U.S. Coast Guard Auxiliary, volunteered to work with homeless veterans, including at an outdoor event which involved an overnight stay in a tent, and also regularly encountered homeless veterans at VA facilities. This history was known, or should have been known, to Ms. Robison's VA healthcare providers.

On April 17, 2019, Ms. Robison was seen in the emergency department at the Long Beach VAMC. She reported a two-month history of a productive cough associated with chest tightness and congestion, sore throat, sinus congestion, fatigue, and headache. Ms. Robison was seen and evaluated by a physician assistant, Kerry A. Homotoff ("Ms. Homotoff"), who noted that the patient had been seen "several times" previously for these symptoms and been treated variously with a Z-pak, nebulizer treatment, inhaler, Medrol dosepak, and over-the-counter medications with little relief in her symptoms. Ms. Homotoff noted that Ms. Robison had no history of asthma or smoking. Ms. Homotoff noted in the physical examination part of her note with regard to Ms. Robison's lungs: "Breath sounds throughout, sounds tight, scattered rhonchi…." With regard to the chest x-ray performed, Ms. Homotoff noted: "? infiltrate/atelectasis on L." Interestingly, the radiology report prepared by Dr. Asha Goud made no mention of the findings documented by Ms. Homotoff. A DuoNeb treatment was administered and Ms. Robison was diagnosed with "bronchitis/early PNA" (pneumonia). Prescriptions were given for Albuterol, Doxycycline, and Tessalon Perles.

Subsequently, on May 11, 2019, Ms. Robison returned to the Long Beach VAMC emergency department, and was again seen by a physician assistant, Carla F. Tapia ("Ms. Tapia"). Ms. Robison reported similar symptoms, including cough, congestion, fever, body aches, and "burning to her lungs and tightness to her chest with coughing." Ms. Robison reportedly said that she thought she had "another bronchitis." A chest x-ray interpreted by Dr. Baruch Meer was reportedly without abnormal findings. Ms. Tapia noted in the record that Ms. Robison specifically "**requested CT chest to r/o fungal infection**," and that she discussed this request with the ER attending, "Dr. Barry," who reportedly recommended that Ms. Robison follow-up with her primary medical doctor. The diagnosis was upper respiratory infection. Robitussin, Albuterol, and Tessalon Perles were recommended, as well as increased fluids and rest. Ms. Robison returned home.

The following day, Ms. Robison contacted the Long Beach VAMC via Secure Messaging:

> I realize I am a newly assigned veteran, and have not been in yet for a physical, however, I am in need of a consult to pulmonary clinic. I have had bronchitis since February and just came down with another respiratory infection. This may be bacterial or fungal as previous treatments have not completely cleared it out. I am following the direction given to me by the ER on Saturday and experiencing another fever. Can you see me sooner than my scheduled appointment? Can you place a consult for pulmonary?

On May 13, 2019, Devi Athiappan, RN ("Nurse Athiappan") noted in response to this message:

<span style="color:red">**Exhibit A**
**Page 3**</span>

> 1) Per our discussion on the phone earlier, please remember to go to the ER if you're having urgent symptoms such as high fever, trouble breathing, shortness of breath, chest pain or others.
> 2) Please use your albuterol inhaler only every 4-6 hours when needed
> 3) Please feel free to message us for any earlier appointments, otherwise we will see you Friday May 24 for a focused short visit with NP Erika Ongoco for your pulmonary concerns.
> 4) Then we will see you after your training trip on June 18 at 9 am for a full appointment to establish care with Erika.

Ms. Robison was able to be seen in the primary care clinic on May 14, 2019, by Erika Krisha P. Ongoco, a nurse practitioner ("Ms. Ongoco"). Ms. Ongoco documented Ms. Robison's recent history in some detail and in the Review of Symptoms section of her note included shortness of breath, cough and wheezing. Ms. Ongoco diagnosed Ms. Robison with "cough" and prescribed promethazine, an antihistamine. No chest CT was ordered, however.

On June 6, 2019, Ms. Robison contacted the Long Beach VAMC Women's Health Clinic via Secure Messaging:

> Do you have any appointments today? I would like a culture. This week it is getting worse again. My glands are swollen again, no voice, the color of the mucus is getting darker and I've been dizzy. I never got any call from a specialty clinic. I leave tomorrow for 10 days and I am concerned.

A couple of hours later, Maria Paz Japzon, RN ("Nurse Japzon") responded to Ms. Robison's message:

> I tried to reach you over the phone earlier but was unable to reach you. Unfortunately, I don't have an appointment for the provider today. I wanted to further follow up with you regarding your symptoms. Are you having any shortness of breath, chest pain? Any new fever, chills, nausea, or vomiting? I see that previously NP Ongoco had ordered promethazine for you. Was this effective in helping? Are you still taking any medications at this time? If you are having any shortness of breath or chest pain, especially with your dizziness, please make sure to present to our emergency department.

Ms. Robison quickly responded, again via Secure Messaging:

> I received your message and called back and left a VM. When I picked up the medicine that day there was only the cough syrup which really hasn't helped. I thought something else would be mailed and never received the antihistamine. I am vomiting though only because the coughing gets bad and triggers it. My temp is still just a point high, normal for me is 96.5. My blood pressure was low last week and the nurse kept taking it until it went up. First reading was 87/50's and she seemed concerned. No more chest pain, shortness of breath - yes occasionally. Dizzy - yes, on occasion.

Exhibit A
Page 4

Nurse Japzon responded shortly after:

> We're sorry to have missed your call but thank you for getting back
> to us. I will forward your symptoms to the provider for review &
> update you with her recommendations. Thank you for your time.

Five days after these messages, on June 11, 2019, Ms. Ongoco responded by writing an addendum:

> ER precautions re: low BP, SOB, and dizziness. Last seen 5/14 with
> scheduled appt 6/18. 5/28 essentially normal CBC. Sx likely of
> chronic rhinitis. Prescribed promethazine which is an antihistamine.
> Recommend fluticasone nasal spray and montelukast.

Ms. Robison was seen as scheduled by Ms. Ongoco on June 18, 2019 and presented with essentially the same symptoms she had been experiencing since February: productive cough, wheezing, fevers, fatigue, and shortness of breath. Ms. Robison in particular expressed her concern about still having a productive cough. She again reported uncontrollable coughing to the point of vomiting. On examination, Ms. Ongoco noted a cough productive of dark yellow thick sputum and rhonchi in the bilateral upper lobes. Ms. Ongoco's assessment on this visit was "chronic cough." She ordered a sputum culture, a chest x-ray, and a prescription for montelukast. Ms. Ongoco also noted that she would "consider PFT, pulmonary consult." Ms. Robison was advised to return to clinic by telephone in two weeks.

The chest x-ray was performed this same day, on June 18, 2019. Significant findings included:

> There is a nodular opacity in the left middle lung zone which
> appears stable from prior exams but was not seen on 5/8/2013.
> There are a few additional ground-glass opacities in the left upper
> lobe.

In the impression section of the report, the radiologist noted the following:

> Persistent nodular opacity over the left middle lung zone which may
> represent summation artifact, focal atelectasis/scarring, or nodule.
> Recommend further evaluation with CT thorax.

Ms. Robison was not advised of the recommendation for a CT and there is no indication in her chart that one was ordered by Ms. Ongoco or anyone else.

While awaiting a follow up telephone appointment with Ms. Ongoco, Ms. Robison's condition continued to decline. On June 28, 2019, Ms. Robison contacted the Long Beach VAMC Women's Health Clinic again via Secure Messaging:

> Hello I am running a fever again. This keeps happening. I don't see
> the lab results I took after our visit. Also I have not got a call from
> MRI.

There was no response to Ms. Robison's message until July 1, 2019, at which point she had already been admitted to an outside hospital.

On June 30, 2019, a friend brought Ms. Robison to the emergency department at Long Beach Memorial Hospital, concerned because she had a fever of over 103 degrees and was exhibiting signs of confusion. Upon learning that Ms. Robison had been ill on and off since February 2019, a CT scan was ordered and found a "significant large obstructing pneumonia with concern for multifocal aspect." Ms. Robison was admitted to the hospital and started on antibiotics.

On the following day, Ms. Robison was seen for a consultation with an infectious disease specialist, who noted that her chronic illness was consistent with a chronic respiratory process, including the possibility of mycobacterial infections such as tuberculosis. Ms. Robison tested positive for tuberculosis and treatment with RIPE (4-drug therapy with rifampin, isoniazid, pyrazinamide, and ethambutol) commenced by July 2, 2019.

Ms. Robison remained hospitalized at Long Beach Memorial Hospital until July 16, 2019. During part of this admission, she required ICU-level care for hypotension. Her symptoms improved gradually with treatment and she was discharged home after being cleared by the Department of Public Health.

Over the next 10 months, Ms. Robison suffered tremendously. Cough, chest pain, and shortness of breath continued and progressed. She required at least 11 separate hospitalizations at the Long Beach VA Medical Center and numerous other hospitals, including Johns Hopkins in Baltimore. Ms. Robison's left lung repeatedly collapsed. She had countless procedures, including numerous bronchoscopies, PEG and other tube placements, and ultimately thoracotomy, pneumonectomy, ECMO cannulation, and myocutaneous muscle flap performed at Johns Hopkins in March 2020.

Despite treatment, Ms. Robison died on May 9, 2020 of respiratory failure due to pulmonary tuberculosis.

VA healthcare providers at the Long Beach VAMC were negligent in their treatment of Melissa F. Robison in the following respects: (a) negligent failure to appropriately evaluate and treat Ms. Robison's chronic respiratory illness; (b) negligent failure to appropriately assess Ms. Robison's risk factors for tuberculosis, including her work with and exposure to homeless veterans; (c) negligent interpretation of chest x-rays; (d) negligent failure to order a CT scan to evaluate Ms. Robison's repeated complaints and continuing symptoms; (e) negligent failure to refer Ms. Robison to a pulmonologist, infectious disease, or other specialist for appropriate evaluation of her chronic respiratory illness; (f) negligently failing to provide prompt and appropriate medical advice and evaluations in response to the patient's numerous messages; (g) negligent delay in diagnosing and treating tuberculosis; and (h) any other deviations from the standard of care which will be developed through further investigation, discovery, and expert review. Due to the aforementioned negligence of her VA healthcare providers at the Long Beach VAMC, Ms. Robison's tuberculosis was not diagnosed in a timely manner, resulting in progression of the disease to the point that it became incurable, resulted in numerous complications, and caused her death on May 9, 2020.

Please note that the claim description contained in Box 8 of the SF-95 and in this Attachment is intended to be a good faith effort to orient the VA to the care presently believed to be deficient and the injuries presently believed to have been sustained as a result of those deficiencies. However, as is often the case in medical claims, a detailed review of the medical records in conjunction with expert reports may reveal additional shortcomings in care and/or injuries. Thus, the "Basis of Claim" provided is not meant to be exhaustive of all possible theories of recovery for

Ms. Bowering. Rather, the VA is hereby put on notice for the purposes of conducting its claim investigation that Ms. Bowering seeks recovery for all aspects of medical care and treatment that deviated from the standard of care and caused injury to and the death of her mother, Melissa F. Robison (whether specifically enumerated in this claim or not).

**Attachment 2 to FTCA Claim of Kathleen F. Bowering, Individually
and on Behalf of the Estate of Melissa F. Robison, deceased**

11.   **Witnesses** – *continued from SF-95*

Healthcare providers of Melissa F. Robison at Long Beach Memorial Medical Center, 2801 Atlantic Avenue, Long Beach, CA 90807.

Healthcare providers of Melissa F. Robison at Loma Linda University Medical Center, 11234 Anderson Street, Loma Linda, CA 92354.

Healthcare providers of Melissa F. Robison at St. Mary's Medical Center, 1050 Linden Avenue, Long Beach, CA 90813.

Healthcare providers of Melissa F. Robison at MemorialCare Long Beach Medical Center, 2801 Atlantic Avenue, Long Beach, CA 90806.

Healthcare providers of Melissa F. Robison at PIH Health Downey Hospital, 11500 Brookshire Avenue, Downey, CA 90241.

Healthcare providers of Melissa F. Robison at Urgent Care Plus, 555 E. Ocean Boulevard, Suite 110, Long Beach, CA 90802.

Healthcare providers of Melissa F. Robison at The Johns Hopkins Hospital, 1800 Orleans Street, Baltimore, MD 21287.

Healthcare providers of Melissa F. Robison at San Gorgonio Memorial Hospital, 600 N. Highland Springs Avenue, Banning, CA 92220.

Employees and/or healthcare providers at the City of Long Beach Department of Public Health, 2525 Grand Avenue, Long Beach, CA 90815.

Mindy Toombs (friend of Ms. Robison), 1632 Le Conte Drive, Beaumont, CA 92223.

## AUTHORIZATION FOR REPRESENTATION AND SIGNATURE

This is to certify that I have retained the services of Rawls Law Group PC to represent me in a claim against the United States government. I further authorize the attorneys of that firm to sign and submit such claim on my behalf.

_Kathleen Bowering_
**Kathleen F. Bowering**

10 | 15 | 2020
Date

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF RIVERSIDE
## RIVERSIDE, CALIFORNIA

### CERTIFICATE OF DEATH

| STATE FILE NUMBER | | LOCAL REGISTRATION NUMBER |
|---|---|---|
| 3052020103036 | | 3202033006538 |

| 1. NAME OF DECEDENT- FIRST (Given) | 2. MIDDLE | 3. LAST (Family) | |
|---|---|---|---|
| MELISSA | FAITH | ROBISON | |

AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST)
MELISSA JEAN HALEY MELISSA JEAN BOWERING

| 4. DATE OF BIRTH mm/dd/ccyy | 5. AGE Yrs. | IF UNDER ONE YEAR | IF UNDER 24 HOURS | 6. SEX |
|---|---|---|---|---|
| 09/05/1976 | 43 | | | F |

| 7. BIRTH STATE/FOREIGN COUNTRY | 10. SOCIAL SECURITY NUMBER | 11. EVER IN U.S. ARMED FORCES? | 12. MARITAL STATUS/SRDP at Time of Death | 7. DATE OF DEATH mm/dd/ccyy | 8. HOUR (24 Hour) |
|---|---|---|---|---|---|
| MA | 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 | YES [X] NO UNK | DIVORCED | 05/09/2020 FND | 0808 FND |

| 13. EDUCATION | 14/15. WAS DECEDENT HISPANIC/LATINO/A/SPANISH? If yes, see worksheet on back | 16. DECEDENT'S RACE | |
|---|---|---|---|
| MASTER'S | [X] NO | WHITE | |

| 17. USUAL OCCUPATION – Type of work for most of life, DO NOT USE RETIRED | 18. KIND OF BUSINESS OR INDUSTRY | 19. YEARS IN OCCUPATION |
|---|---|---|
| MANAGEMENT CONSULTANT LIFE COACH | TRAUMA HEALING | 22 |

| 20. DECEDENT'S RESIDENCE (Street and number, or location) | | | |
|---|---|---|---|
| 233 CLAREMONT AVENUE APT 9 | | | |

| 21. CITY | 22. COUNTY/PROVINCE | 23. ZIP CODE | 24. YEARS IN COUNTY | 25. STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| LONG BEACH | LOS ANGELES | 90803 | 8 | CA |

| 26. INFORMANT'S NAME, RELATIONSHIP | 27. INFORMANT'S MAILING ADDRESS |
|---|---|
| KATHLEEN BOWERING, DAUGHTER | 6616 PALO VERDE AVENUE, TWENTYNINE PALMS, CA 92277 |

| 29. NAME OF SURVIVING SPOUSE/SRDP–FIRST | 28. MIDDLE | 30. LAST (BIRTH NAME) | |
|---|---|---|---|
| | | | |

| 31. NAME OF FATHER/PARENT–FIRST | 32. MIDDLE | 33. LAST | 34. BIRTH STATE |
|---|---|---|---|
| MARK | DAVID | RASMESEN | MA |

| 35. NAME OF MOTHER/PARENT–FIRST | 36. MIDDLE | 37. LAST (BIRTH NAME) | 38. BIRTH STATE |
|---|---|---|---|
| KATHRYN | ANN | ROBISON | MA |

| 39. DISPOSITION DATE mm/dd/ccyy | 40. PLACE OF FINAL DISPOSITION | | 47. LICENSE NUMBER |
|---|---|---|---|
| 05/19/2020 | RIVERSIDE NATIONAL CEMETERY | | |
| 41. TYPE OF DISPOSITION(S) | 22495 VAN BUREN BLVD, RIVERSIDE, CA 92518 | | |
| BU__ | 42. SIGNATURE OF EMBALMER ▸ NOT EMBALMED | | |

| 44. NAME OF FUNERAL ESTABLISHMENT | 45. LICENSE NUMBER | 46. SIGNATURE OF LOCAL REGISTRAR | 47. DATE mm/dd/ccyy |
|---|---|---|---|
| AKES FAMILY FUNERAL HOME | FD1276 | ▸ CAMERON KAISER, MD | 05/13/2020 |

| 101. PLACE OF DEATH | 10A. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) | 102. IF HOSPITAL, SPECIFY ONE | 103. IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|---|
| A RESIDENCE | | | [X] Other |
| 104. COUNTY OF DEATH | 1632 LE CONTE DRIVE | | |
| RIVERSIDE | | BEAUMONT | |

| 107. CAUSE OF DEATH | | Time Interval Between Onset and Death | 108. DEATH REPORTED TO CORONER? |
|---|---|---|---|
| IMMEDIATE CAUSE (A) RESPIRATORY FAILURE | | MINS | [X] YES  NO |
| | | | 2020-05667 |
| (B) PULMONARY TUBERCULOSIS | | 1 YEAR | 109. BIOPSY PERFORMED? YES [X] NO |
| (C) | | | 110. AUTOPSY PERFORMED? YES [X] NO |
| (D) | | | 111. USED IN DETERMINING CAUSE? YES  NO |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| VOCAL CORD PARALYSIS |

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? If yes, list type of operation and date | 113A. IF FEMALE, PREGNANT IN LAST YEAR? |
|---|---|
| LEFT PNEUMONECTOMY 03/03/2020 | YES [X] NO  UNK |

| 114. I CERTIFY TWO TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 115. SIGNATURE AND TITLE OF CERTIFIER | 116. LICENSE NUMBER | 117. DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since | Decedent Last Seen Alive | ▸ BINDU NOOR M.D. | C146368 | 05/12/2020 |
| 11/01/2019 | 05/04/2020 | 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE  BINDU NOOR M.D. | | |
| | | 5901 7TH ST E, LONG BEACH, CA 90822 | | |

| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED IN THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 120. INJURED AT WORK? | 121. INJURY DATE mm/dd/ccyy | 122. HOUR (24 Hour) |
|---|---|---|---|
| MANNER OF DEATH:  Natural  Accident  Homicide  Suicide  Pending Investigation  Could not be determined | YES  NO  UNK | | |
| 123. PLACE OF INJURY (e.g.: home, construction site, wooded area, etc.) | | | |

| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) |
|---|
| |

| 125. LOCATION OF INJURY (Street and number, or location, and city, and zip) |
|---|
| |

| 126. SIGNATURE OF CORONER / DEPUTY CORONER | 127. DATE mm/dd/ccyy | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| ▸ | | |

| STATE REGISTRAR | A | B | C | D | | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|

*01500100453782B*

CERTIFIED COPY OF VITAL RECORD

STATE OF CALIFORNIA }
COUNTY OF RIVERSIDE } SS

This is a true and exact reproduction of the document officially registered and placed on file by the the Riverside University Health System, Department of Public Health.

DATE ISSUED   Jun 3, 2020

This copy is not valid unless prepared on an engraved border, displaying the date, seal, and signature of the Registrar.

Dr. Cameron Kaiser, M.D., County Health Officer
RIVERSIDE COUNTY, CALIFORNIA

*001814230*

SEAL OF THE COUNTY OF RIVERSIDE · CALIFORNIA

COUNTY OF RIVERSIDE · REGISTRAR OF VITAL RECORDS

**Exhibit A**
**Page 10**

# EXHIBIT B

April 13, 2021

Mr. Glen H. Sturtevant, Jr.
Rawls Law Group, PC
211 Rocketts Way
Suite 100
Richmond, VA 23231

Re:     Estate of Melissa F. Robison

Dear Mr. Sturtevant:

As requested, I have reviewed the imaging and medical records of Ms. Robison from the Long Beach, California VA Medical Center.

With regard to my qualifications, I received my medical degree from the University of Virginia School of Medicine in 1985, after which I completed a residency in Diagnostic Radiology at Jackson Memorial Hospital in Miami, Florida, followed by a fellowship in Radiology at Georgetown University Hospital in Washington, D.C. I am Board-certified in Radiology and have been in private practice since 1990.

All of my opinions are held to a reasonable degree of medical certainty.

In reviewing the imaging and medical records, Ms. Robison had a several month history of productive cough, chest tightness, congestion, sore throat, fatigue, and headache for which she received steroid and nebulizer treatments. She was admitted to the VA's emergency department on April 17, 2019 for these symptoms and received a chest x-ray, which the radiologist reported as normal.

Approximately three weeks later, Mr. Robison was again admitted to the emergency department on May 11, 2019 for similar symptoms. The patient reported a "burning in her lungs and tightness in her chest with coughing." Another chest x-ray was performed and again was reported as normal. She was given a diagnosis of upper respiratory infection.

Five weeks later, on June 18, 2019, Ms. Robison was seen in the VA's Women's Health Clinic with the same unresolved symptoms. Another chest x-ray was performed the same day, which showed "a nodular opacity in the left middle lung zone which appears stable from prior exams but was not seen on 5/8/2013. There are a few additional ground-glass opacities in the left upper lobe." The impression was: "Persistent nodular opacity over the left middle lung zone which may represent summation artifact, focal atelectasis/scarring, or nodule. Recommend further evaluation with CT thorax." No CT appears to have been ordered or performed, however.

The patient was subsequently admitted to Long Beach Memorial Hospital on June 30, 2019 and a "significant large obstructing pneumonia with concern for multifocal aspect" was found on CT. Following an infectious disease consult the following day, Ms. Robison was diagnosed with tuberculosis.

**Exhibit B**
**Page 1**

In my assessment of the imaging and medical records, specifically the chest x-rays performed on April 17, 2019 and May 11, 2019 and the corresponding radiology reports, it is my opinion to a reasonable degree of medical certainty that the VA radiologists who interpreted those chest x-rays breached the standard of care in failing to note the abnormal findings on those x-rays and instead incorrectly interpreted those films as normal.

Specifically, in the April 17, 2019 chest x-ray, there is a density in the left para-hilar area. It is an abnormal density along the left side of the heart. That is indeed an abnormal finding and should have been reported as such. The failure of the VA radiologist to identify and note this abnormal finding was a breach of the standard of care. Importantly, the left main bronchus still appears normal on this x-ray.

In the May 11, 2019 chest x-ray, the density seen on the April 17 x-ray is still present and, importantly, does not appear to have progressed over the intervening three weeks. Again, the VA radiologist's failure to note this abnormality was a breach of the standard of care. Notably, the left main bronchus is visible on this x-ray and still appears normal with only a small amount of narrowing and no volume loss, again indicating little progression since the previous x-ray.

Indeed, in light of this persistent density seen on both chest x-rays, the standard of care required the identifying of this abnormality, recommendation of a CT scan, and direct communication with the patient's treating physician. The differential diagnosis would include lung cancer and granulomatous infection, requiring immediate further workup, which would have led to an earlier diagnosis of the TB infection in May 2019.

Given that the density was essentially unchanged between the April 17 and May 11 chest x-rays indicated that the infection was progressing slowly and therefore likely treatable. By the time a CT was performed at the private hospital on July 1, 2019, the narrowing of the tracheobronchial tree was significant, and the left bronchus was now severely narrowed and starting to have volume loss in the left lung, indicating that there was a significant progression of the TB infection over the course of the month of June given the minimal narrowing of the left bronchus seen on the April 17 and May 11 chest x-rays.

I hold all of these opinions stated in this letter to a reasonable degree of medical certainty.

Sincerely,

Daryl Fanney, M.D.

# EXHIBIT C

January 14, 2022

Glen Sturtevant
Rawls Law Group, PC
211 Rocketts Way, Suite 100
Richmond, VA 23231

Re:     *Estate of Melissa F. Robison, deceased v. U.S.*

Dear Mr. Sturtevant:

At your request, I have reviewed medical records relating to the medical care provided to Ms. Robison at the Long Beach VA Medical Center with regard to the delay in the diagnosis and treatment of tuberculosis, as well as her subsequent medical care at non-VA facilities.

By way of background, I am a pulmonologist Board-certified in Pulmonary Medicine, Internal Medicine, and Critical Care Medicine. I am also Professor of Medicine in the Division of Pulmonary and Critical Care Medicine at the University of California, San Francisco School of Medicine; Director of the UCSF Center for Tuberculosis; Director of Clinical Trial Operations in the UCSF Office of Research; and Medical Director of the UCSF CTSA Trials Innovation Hub. I received my medical degree from the School of Medicine at the University of California, Irvine, followed by a residency in Internal Medicine at Scripps Clinic, and a fellowship in Pulmonary and Critical Care Medicine at the University of California, San Francisco.

I also lead NIH and CDC-funded field studies of new TB diagnostics, Phase 2 and 3 clinical trials in TB therapeutics, and latent TB infection treatment implementation studies in partnership with the Vietnam National TB Program, the Vietnam National Lung Hospital, the Hanoi Lung Hospital, Cho Ray Hospital, and the Vietnam National Institute of Hygiene and Epidemiology. I further oversee NIH and BMGF-funded TB biomarker discovery and qualification programs. I previously led the WHO Task Force for New TB Drugs and Treatment Regimens, chaired and contributed to the development of U.S. and international practice guidelines for the treatment of TB, and have provided clinical TB consultation and trainings as part of the UCSF Curry International TB Center of Excellence. My curriculum vitae is enclosed.

My opinions are ones that I hold to a reasonable degree of medical certainty.

Background

Ms. Robison was a 43-year-old United States Army veteran at the time of her death on May 9, 2020. She presented to the Long Beach VAMC emergency department on April 17, 2019 with complaints of a productive cough, chest tightness, congestion, fatigue she had been experiencing for the previous two months. A physician's assistant documented in the patient's chart that she had previously been seen "several times" for these symptoms. Various treatments had been unsuccessful, including Z-pak, nebulizer, inhaler, Medrol dosepak, and OTC medications. Notably, the patient's respiratory symptoms persisted despite these treatments. The PA further documented that the patient had no history of smoking or asthma. On physical examination, it was noted, "Breath sounds throughout, sounds tight, scattered rhonchi." A chest x-ray was ordered and performed; however, the VA radiologist identified no abnormalities. A diagnosis of "bronchitis/early PNA" was made, a DuoNeb treatment administered, and prescriptions were given for Albuterol, Doxycycline, and Tessalon Perles.

Exhibit C
Page 1

Despite this treatment, Ms. Robison's symptoms continued to persist. She presented again to the emergency department approximately three weeks later, on May 11, 2019. Another physician's assistant in the ED documented the patient's symptoms as cough, congestion, fever, body aches, and "burning to her lungs and tightness to her chest with coughing." Another chest x-ray was performed. Again, the radiologist who interpreted the imaging did not identify any abnormalities. During this ED visit, the patient herself reportedly "requested CT chest to r/o fungal infection." The attending physician in the ED, however, only recommended Ms. Robison to follow up with her primary care provider. She was diagnosed with an upper respiratory infection and advised to take Robitussin, Albuterol, and Tessalon Perles.

According to the secure messaging notes in the patient's VA medical records, Ms. Robison sent a message to her VA providers the following day, May 12, 2019, stating "I am in need of a consult to pulmonary clinic. I have had bronchitis since February and just came down with another respiratory infection. This may be bacterial or fungal as previous treatments have not completely cleared it out . . . Can you place a consult for pulmonary?"

On May 13, 2019, a secure message reply was sent by a nurse at the VA, stating "we will see you Friday May 24 for a focused short visit with NP Erika Ongoco for your pulmonary concerns . . . Then we will see you after your training trip on June 18 at 9 am for a full appointment to establish care with Erika."

According to the patient's chart, Ms. Robison was seen the following day, May 14, 2019, by NP Ongoco. This was a visit in the primary care clinic, not a pulmonology consult. In the chart, NP Ongoco noted Mr. Robison's symptoms included shortness of breath, cough, and wheezing. NP Ongoco further diagnosed "cough" and prescribed for Mr. Robison promethazine. No chest imaging was ordered at this visit.

Approximately three weeks later, on June 6, 2019, Mr. Robison again contacted her VA medical providers via secure messaging, stating, "Do you have any appointments today? I would like a culture. This week it is getting worse again . . . the color of the mucus is getting darker and I've been dizzy. I never got any call from a specialty clinic. I leave tomorrow for 10 days and I am concerned." In another message the same day, Ms. Robison noted she had significant coughing, enough to trigger vomiting, low fever, low blood pressure, and occasional shortness of breath and dizziness. Ms. Robison was not referred to a pulmonology consult, however.

On June 18, 2019, Ms. Robison was seen in the primary care clinic for her scheduled visit with NP Ongoco. She continued to have the same symptoms she had been experiencing for four months, since February 2019, including productive cough, wheezing, fever, fatigue, and shortness of breath. NP Ongoco noted Ms. Robison was producing dark yellow thick sputum and had rhonchi in the bilateral upper lobes. Another chest x-ray was ordered, and NP Ongoco noted she would "consider PFT, pulmonary consult." Importantly, the chest x-ray, performed the same day, was interpreted to show "Persistent nodular opacity over the left middle lung zone which may represent summation artifact, focal atelectasis/scarring, or nodule. Recommend further evaluation with CT thorax."

Despite the radiologist's findings, there does not appear to have been any follow up on the part of NP Ongoco or any other VA providers and no CT was ordered or recommended to Ms. Robison.

Ms. Robison was admitted to the emergency department at Long Beach Memorial Hospital on June 30, 2019 because she had spiked a fever and was experiencing confusion and continued

Exhibit C
Page 2

respiratory symptoms. Upon admission, it was quickly discovered that Ms. Robison was suffering from tuberculosis, and treatment commenced on July 2, 2019.

After an additional two-week hospitalization, Ms. Robison was discharged home. However, her condition had already been significantly compromised by length of time her TB went untreated. She was hospitalized several more times over the following months, suffered the collapse of her left lung, and underwent numerous procedures. Because of her compromised condition, however, Ms. Robison succumbed to respiratory failure due to pulmonary tuberculosis and died on May 9, 2020.

Opinions

Based on my review of the medical records, it is my opinion to a reasonable degree of medical certainty that the overall clinical care and treatment provided to Ms. Robison by her healthcare providers at the Long Beach VA following her initial presentation to the emergency department on April 17, 2019 fell below the standard of care in several respects and more likely than not caused Ms. Robison's untimely death. Had Ms. Robison been provided adequate care by her Long Beach VA providers, it is more likely than not that Ms. Robison would be alive today. Indeed, the standard of care was breached by Ms. Robison's VA providers' failure to timely identify the abnormalities present on her chest x-ray imaging from April and May 2019, as well as the failure to timely recognize the signs and symptoms of a respiratory illness that was persistent and in need of assessment by a pulmonary specialist. These breaches of the standard of care caused Ms. Robison's untimely death.

As an initial matter, I agree with Dr. Fanney's opinions that the VA radiologists who interpreted the April 17, 2019 and May 11, 2019 chest x-rays failed to note the abnormal findings present on those x-rays. There is a concerning and persistent density in the left para-hilar area seen in both x-rays that should have been reported and acted upon by Ms. Robison's care team. As noted by Dr. Fanney, the left main bronchus does appear normal in both x-rays with no volume loss, which demonstrates the progression of the TB over that three-week period was still limited. The July 1, 2019 CT performed at Long Beach Memorial, however, does show significant narrowing of the tracheobronchial tree, severe narrowing of the left bronchus, and volume loss in the left long, all of which demonstrate significant progression of the TB during the month of June 2019. It was imperative that the abnormalities seen on the April and May 2019 chest x-rays be reported, and followed up on with a referral to a pulmonologist and a chest CT. The failure to do was a breach of the standard of care.

But regardless of the readings of those chest x-rays, Ms. Robison's symptoms and clinical picture on their own mandated that she be referred to a pulmonary specialist following both the April and May visits. Indeed, her respiratory symptoms of productive cough, shortness of breath, and chest tightness had persisted for several months without relief from several courses of treatments, including antibiotics. It was obvious that she was suffering from something more serious than "chronic cough" or even bronchitis. Her symptoms did not abate no matter the treatments she was provided. She self-advocated and requested specialty consultation for these very reasons. The failure to refer the patient to a specialist following these visits was a breach of the standard of care.

Had the April and May 2019 chest x-rays been properly read, or her symptoms and clinical picture been properly assessed, and Ms. Robison been referred to a pulmonologist in April, May, or early June 2019, it is more likely than not that TB treatment and interventions would

Exhibit C
Page 3

have been implemented and that Ms. Robison more likely than not would have had a successful recovery and would not have succumbed to complications from tuberculosis.

It is well known and instructed as part of medical and nursing school curricula that the diagnosis of TB frequently requires a high index of suspicion. Once TB is considered, sputum or other specimens are collected for TB nucleic acid amplification test (NAAT), acid-fast bacilli (AFB) smear, growth detection, and drug-susceptibility testing. As noted in the ATS/CDC/IDSA official practice guidelines for diagnosis of TB (Lewinsohn, et al., CID 2017), it is recommended that smear microscopy, mycobacterial cultures and molecular diagnostic assays be performed, rather than not, in all patients suspected of having pulmonary TB. Had Ms. Robison's symptoms and clinical picture been properly assessed, or had she been referred to a pulmonologist, these diagnostic tests would have more likely than not been ordered and would have identified her TB disease earlier. Moreover, the ATS/CDC/IDSA official practice guidelines on the treatment of TB (Nahid, et al, CID, 2016) notes that the decision to initiate combination chemotherapy for tuberculosis is based on clinical, radiographic, laboratory, patient, and public health factors. In addition, clinical judgement and the index of suspicion for tuberculosis are critical in making a decision to initiate treatment. The failure to timely diagnose and treat TB has been shown to worsen illness severity, prolong patient suffering, increase the risk of patient death, and facilitate the transmission of the disease to the community. Successful cure of the TB disease and survival was more likely than not for Ms. Robison had she received timely diagnosis and treatment of TB as recommended by US and international practice guidelines.

I reserve the right to revise and/or expand my opinions based on the review of further information.

Sincerely,

Payam Nahid, MD, MPH
Professor of Medicine
University of California, San Francisco

Exhibit C
Page 4